Dairy Service, Inc. v. Commissioner. Marjorie G. Hugo v. Commissioner.
Dairy Service, Inc. v. Commissioner
Docket Nos. 1150-64 and 1162-64.
United States Tax Court
T.C. Memo 1966-113; 1966 Tax Ct. Memo LEXIS 169; 25 T.C.M. (CCH) 605; T.C.M. (RIA) 66113; May 27, 1966
*169 Frank P. Holton, Jr., for the petitioner in Docket No. 1150-64 and Russell M. Robinson, II, for the petitioner in Docket No. 1162-64. Bernard A. Heeke, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner Dairy Service, Inc., for the taxable year November 1 to December 31, 1959, and the calendar years 1960 and 1961 in the amounts of $73.50, $441 and $441, respectively, and determined a deficiency in the income tax of petitioner Marjorie G. Hugo for the calendar year 1959 in the amount of $3,499.73. The issue for decision is whether $10,735.85 of the amount paid by Dairy Service, Inc., to Marjorie G. Hugo in the calendar year 1959 was paid as part of the purchase price of goodwill of a business and therefore taxable to Marjorie G. Hugo only as gain on the sale of a capital asset and not subject to amortization by Dairy Service, Inc., or whether this amount was in payment for a covenant by Marjorie G. Hugo not to compete with Dairy Service, Inc. and therefore ordinary income to Marjorie G. Hugo and amortizable over the 10-year period of the covenant by Dairy Service, Inc. *170 Findings of Fact Some of the facts have been stipulated and are found accordingly. Dairy Service, Inc. (hereinafter referred to as Dairy Service) is a corporation organized under the laws of the State of North Carolina in 1959. Its principal office is located in Lexington, North Carolina and it filed its Federal income tax returns for the taxable year November 1 to December 31, 1959 and the calendar years 1960 and 1961 with the district director of internal revenue, Greensboro, North Carolina. Marjorie G. Hugo (hereinafter referred to as Marjorie), an individual residing in Blowing Rock, North Carolina, filed her individual Federal income tax return for the calendar year 1959 with the district director of internal revenue, Greensboro, North Carolina. After receiving a B.S. Degree in Mathematics from Memphis State College in Memphis, Tennessee, and a Masters degree from George Peabody College for Teachers in Nashville, Tennessee, Marjorie taught for several years in the public schools in Tennessee and Kentucky. In mid-1942 she entered the military service and served from that time until December 1946 when she was discharged from the Women's Air Force with the rank of Major. *171 She resumed her teaching career and also took correspondence courses in bookkeeping and accounting. After completing these courses Marjorie was employed by the Federal government at Eglin Air Force Base at Eglin Field, Florida. She remained in the employ of the Federal government until late in 1952 when she resigned to take a position with the Edward B. McClain Company in Memphis, Tennessee. At the time she resigned her government position Marjorie's title was analytical statistician, engineering, and her grade was GS-13. The Edward B. McClain Company by which Marjorie was employed in December 1952 had its main office in Memphis, Tennessee and was engaged in a dairy accounting and consulting service. The Edward B. MEclain Company was a national company with approximately 150 clients. In Marjorie's work with the Edward B. McClain Company she visited clients on field trips and worked with them on their cost comparison figures. During the course of her work she concluded that the average figures which were being used by the McClain Company for cost comparison with the various dairies which were being serviced were not very meaningful. She therefore proposed the idea that the company *172 obtain the cost figures of the small dairies on a confidential basis and make a code from the information obtained to use for comparison with the operating costs of other small dairy clients thereby improving the service to the clients. The management of the Edward B. McClain Company did not accept her ideas but some of the dairy operators were interested in obtaining the type of service she proposed and encouraged her to go into business for herself. In April 1956 she resigned her position with Edward B. McClain Company and about the first of May of that year moved to Charlotte, North Carolina. Approximately 1 month later when her salary from the Edward B. McClain Company terminated, she began her own business operation as a sole proprietorship using the name Dairy Accounting Service. From the time she left Edward B. McClain Company until she opened her own operation Marjorie was compiling her cost records for use in her business operation and continued to compile such records after she began operation of her own business. In the conduct of her business she competed directly with the Edward B. McClain Company and took 15 to 20 of the North Carolina clients previously served by Edward *173 B. McClain as clients of her business. Shortly after commencing operations of Dairy Accounting Service Marjorie employed Fred Calhoun (hereinafter referred to as Calhoun) to work for her business as a dairy consultant and engineer and in the Fall of 1958 Robert Michael (hereinafter referred to as Michael) was employed by Dairy Accounting Service. In the operation of the business of Dairy Accounting Service, Marjorie and her employees called on their clients which consisted generally of small dairies operating in Alabama, Mississippi, North Carolina, and South Carolina, with most of the clients being located in North Carolina and South Carolina. Usually the person who called on the client would spend a day in consultation with the client on the problems of dairy operation and management, including plant layout and cost accounting procedures and practices. The client would be issued a cost comparison service and supplied with monthly memoranda published by Dairy Accounting Service. Marjorie or her employees, when they called on a client, would talk with the accountant for the client and make suggestions as to cost comparisons and methods of listing costs on the dairy's records but *174 they did not render accounting services as such to the dairy. Although the business of Dairy Accounting Service was reasonably successful Marjorie was concerned about its future operation because of the trend for larger dairies to acquire the smaller dairies. In 1958 Marjorie became interested in mutual funds and in the fall of that year she and several associates decided to form a corporation to operate a retail mutual fund distributorship. The corporation was organized in December 1958 and began operations in the spring of 1959. Marjorie had hoped to be able to maintain both her Dairy Accounting Service business and her association with the Mutual Fund Corporation but in July of 1959 she decided that she would be unable to continue in both businesses. After beginning her work in the mutual funds business, Marjorie had not been devoting the same amount of time to the business of Dairy Accounting Service that she had devoted in prior years. Marjorie had discussed the mutual funds business with Calhoun and attempted to persuade him to go into that business with her. Calhoun in his visits with clients of Dairy Accounting Service would be questioned by clients about Marjorie's lack *175 of visits and Calhoun felt that some of the clients were becoming dissatisfied with Marjorie's lack of attention to the Dairy Accounting Service business. Marjorie decided that in fairness to the clients of Dairy Accounting Service she would not be able to continue as the sole proprietor of that business and also continue her work with the Mutual Fund Corporation. For this reason, sometime shortly after August 31, 1959 she offered to sell the Dairy Accounting Service business to Calhoun at a price of $25,000. Calhoun and Michael discussed with Marjorie the purchase of the business of Dairy Accounting Service. Michael is an accountant and Calhoun is an engineer. Calhoun and Michael were of the opinion that together they would be qualified to fulfill the services rendered by Dairy Accounting Service. The first amount offered by Calhoun and Michael to Marjorie for the purchase of the business was $10,000, which amount Marjorie refused. Early in the negotiations with respect to the purchase of the Dairy Accounting Service business Calhoun and Michael informed Marjorie that they would not purchase the business without an agreement on her part not to compete with them and that they would *176 insist on a signed sales contract containing a covenant on her part not to compete. Calhoun and Michael caused the incorporation of Dairy Services, Inc. for the purpose of having that corporation purchase the assets and liabilities of Dairy Accounting Service. They carried on the negotiations with Marjorie on behalf of the corporation for the purchase of the business. Negotiations were carried on over a period of between 30 and 60 days and during the course of these negotiations Calhoun and Michael had a draft of a proposed contract of sale prepared. This proposed draft contained various provisions with respect to the sale of the business, the payment of accounts payable, and collection of accounts receivable. It contained a paragraph providing for liquidated damages for violation by Marjorie of the covenant not to compete and a paragraph entitled "Covenant Not to Compete" which stated: The Seller agrees not to re-establish, reopen, or in any manner become interested directly or indirectly, either as an employee, owner, partner (dormant or otherwise), agent, stockholder, director, or officer of a corporation, or otherwise, in any business, trade, or occupation similar to the business *177 hereby sold, within the United States for a period of ten (10) years from the date of this sale, October 31, 1959. During said period the Seller shall not canvass, solicit, or accept any business of a similar kind to the one being sold from any present or past clients of the said Dairy Accounting Service; Under the title "Purchase Price" the following appeared: The purchase price for all of the assets referred to herein is… Dollars, of which? Dollars is attributed to the physical assets,… Dollars is attributed to the good will, trade name, and all other intangible assets of the agency, and… Dollars is attributed to the restrictive covenants not to compete. The sum of… Dollars has been paid to the Seller at the time of the execution of this agreement on the purchase price. The sum of… Dollars, in cash or by check, shall be paid on or before * * *. Marjorie took the draft of this contract home over a weekend. She read it and discussed it with an associate in the mutual funds business. Marjorie suggested a number of changes in the draft, including the insertion of a paragraph to be entitled "Definition of Business Conducted by Dairy Accounting Service" which paragraph *178 with some changes from the wording suggested by Marjorie was incorporated in the final contract the pertinent portions of which will be hereinafter set forth. Marjorie also suggested an addition to the paragraph containing the covenant not to compete of the sentence "This paragraph 5(b) shall not be construed so as to restrict or prevent Miss Hugo (Seller) from conducting or engaging in any endeavors not listed" in the preceding paragraph defining the business of Dairy Accounting Service. When the draft was returned to Calhoun and Michael by Marjorie certain figures had been inserted in the blank spaces left under the designation, "Purchase Price," the figure for the purchase price for all assets being inserted in ink as $15,000. Also inserted in ink were the figures of $1,000 for the amount to be paid on execution of the contract and the figure of $11,000 to be paid on a specific date. Other figures in the paragraph dealing with "Purchase Price" had been inserted in pencil, crossed through and written again and apparently certain erasures had also been made. These pencil figures are not in the handwriting of Marjorie, Calhoun or Michael. During the course of the negotiations Calhoun *179 had informed Marjorie that it would be advantageous taxwise to the purchaser to allocate a portion of the purchase price to the covenant not to compete. During the negotiations Marjorie informed Calhoun and Michael that she was willing to enter into a covenant not to compete since upon her sale of the business to them she did not intend to compete with them. Marjorie also discussed with Calhoun and Michael such aspects of the proposed sale as the disposition of the accounts receivable, the assumption of the accounts payable, the net worth of the business, the disposition of the leased office furniture, and the goodwill of the business. Calhoun and Michael were interested in having the covenant cover the entire United States since they hoped to expand the dairy accounting service business into a national business. Since their purchase of the business it has been expanded into 15 States. After submitting a draft contract to Marjorie and her review of it and making suggested changes in it, a final contract was drafted by Calhoun and Michael and submitted to Marjorie. Marjorie took this contract to a lawyer prior to signing it and the latter reviewed the contract and advised her that *180 he saw no objection to the contract and to her signing it. She paid $250 to the lawyer for his services in review of the contract for her. The contract as finally agreed to and executed by the parties on October 31, 1959 provides in part the following: (5a) Definition: The business conducted by Dairy Accounting Service is defined generally as: A business of an advisory and consulting nature, dealing with Milk, Ice Cream, Condensing, and Milk Powder processing and/or distributing organizations for the purpose of surveying and improving accounting methods, production facilities and procedures, office procedures and layouts, distribution methods and facilities; to advise and consult with management on cost comparisons industrial engineering, production, and sales standards, budgets, standard costs, and management controls; to compile, publish or provide analysis of financial statements, statistical data, and cost comparison reports. The main purpose of Dairy Accounting Service has been to increase profits by reducing costs. (5b) Covenant Not to Compete: The Seller agrees not to re-establish, reopen, or in any manner become interested directly or indirectly, either as an employee, *181 owner, partner (dormant or otherwise), agent, stockholder, director, or officer of a corporation, or otherwise, in any business, trade, or occupation similar to the business hereby sold, within the United States for a period of ten (10) years from the date of this sale, October 31, 1959. During said period the Seller shall not canvass, solicit, or accept any business of a similar kind to the one being sold from any present or past clients of the said Dairy Accounting Service; directly or indirectly request or advise any present or future clients of the business to actually curtail, or cancel their business; or directly or indirectly disclose to any other person, firm, or corporation the names of businesses, present or future clients of the Purchaser and the Dairy Accounting Service. This paragraph (5b) shall not be construed so as to restrict or prevent Miss Hugo (Seller) from conducting or engaging endeavors not listed in subparagraph a of this paragraph 5. * * *
(7) Service by Seller: If a present client of the business requests the personal service of the Seller, the Seller may perform said services if she so desires, provided the Purchaser consents thereto and said services *182 are performed through and under the control and direction of the Purchaser. The Purchaser shall bill for said services in its own name. Miss Hugo shall receive eighty (80) per cent of the service charge and her expenses approved by the Purchaser when her work is completed. (8) Purchase Price: The purchase price for all of the assets referred to herein is Fifteen Thousand ($15,000.00) Dollars, of which Three Thousand-Nine Hundred and Sixty-Four and 15/100 Dollars ($3,964.15) is attributed to the net worth, Three Hundred Dollars ($300.00) attributed to the good will, trade name, and all other intangible assets of the agency, and Ten Thousand-Seven Hundred and Thirty-Five and 85/100 Dollars ($10,735.85) is attributed to the restrictive covenants not to compete. The sum of One Thousand Dollars ($1,000.00) has been paid to the Seller at the time of the execution of this agreement on the purchase price. The sum of Eleven Thousand Dollars ($11,000.00), in cash or by check, shall be paid on or before the 15th day of November, 1959, as evidenced by a note of even date. The balance of Three Thousand Dollars ($3,000.00), in cash or by check, shall be paid to the Seller within thirty (30) days *183 after the sale is closed, as evidenced by a note of even date. (9) Liquidated Damages: In view of the difficulty of determining the amount of damages which may result to the Purchaser from a violation of the covenant not to compete as set forth in detail in sub-paragraph (5), the Seller shall pay to the Purchaser One Thousand Dollars ($1,000.00) as liquidated damages for every such breach; provided, however, that the payment of such liquidated damage shall not be construed as a release or waiver by the Purchaser of the right to prevent any such violation in equity or otherwise. In transferring the business of Dairy Accounting Service to Dairy Service, Inc., Marjorie turned over to Dairy Service, Inc., all of the records relating to the business and to the cost comparison and management consultant services, including all of the cost accounting records, client and account lists, data sheets showing each of the dairies' expenses and costs, copies of the reports to the dairies, all correspondence files, the accounts receivable file, all of the books of the business, and the material and information forms prepared for use by the various dairies in reporting to the business. Marjorie *184 also wrote a letter to each of the clients of Dairy Accounting Service informing such clients that she had sold her business to Dairy Service, Inc., and urging them to continue as clients of that company. Marjorie retained the leased furniture and office space but Dairy Service, Inc., paid the rent on both for the month of November 1959. Marjorie on her income tax return for the calendar year 1959 reported a capital gain from the sale of the business, Dairy Accounting Service, in the amount of $9,035.85. The schedule setting forth the method of determining the amount of gain showed a sales price for each asset, other than accounts receivable and the asset designated "good will and agreement not to compete" in an amount equal to its basis to her. Accounts receivable were shown with a zero basis and the total sales price thereof was shown as ordinary income. The item "good will and agreement not to compete" was shown with a zero basis and a sales price of $9,035.85, which amount was shown as long-term capital gain. At the time of the sale of the business there was $2,000 which consisted of 2 months of drawings for Marjorie at a $1,000 a month, which she had not taken out of the business. *185 In accordance with her agreement with the purchaser, Marjorie withdrew this amount subsequent to the sale of the business and in her income tax return included this amount as ordinary income. The figure of $9,035.85 was arrived at by adding the combined figures of $10,735.85 and $300 making a total of $11,035.85 and subtracting therefrom $2,000. Respondent in his notice of deficiency increased the income as reported by Marjorie by the difference between $10,735.85 and $4,367.92 with the following explanation: It is determined that the amount of $10,735.85, allocated in a restrictive agreement dated October 31, 1959, as the portion of the sale price of your business, Dairy Accounting Service, attributable to a covenant not to compete, is ordinary income and not capital gain. Taxable income is, therefore, increased by the amount of $10,735.85 and capital gain reported in your return from such sale in the amount of $4,367.92 is eliminated. Dairy Service, Inc., in its income tax returns for its taxable year November 1 to December 31, 1959, and the calendar years 1960 and 1961, claimed deductions for amortization of the amount allocated by it to the covenant not to compete on the basis *186 of a 10-year life for the asset. Respondent in his notice of deficiency disallowed the deductions as claimed in the amount of $245 for the taxable year November 1 to December 31, 1959 and in the amount of $1,470 for each of the calendar years 1960 and 1961 with the explanation in each year that the deduction claimed for amortization of covenant not to compete was being disallowed followed by the statement "The payment to Marjorie G. Hugo of $15,000.00 did not result in your acquisition of any property subject to amortization or depreciation." Opinion Respondent, at the trial of this case, took a neutral position stating that he had taken inconsistent positions with respect to the two taxpayers, one the buyer and the other the seller of the business, in order to protect the revenue. His position was that if the payment of $10,735.85 of the purchase price by Dairy Service to Marjorie was for a covenant not to compete, then Dairy Service was entitled to amortize this portion of the purchase price over the 10-year period of the covenant and the amount of $10,735.85 constituted ordinary income to Marjorie in the calendar year 1959. On brief, respondent, without abandoning his alternative *187 position with respect to the disallowance of the amortization deductions to Dairy Service, argues that on the record made at the trial of this case the amount of $10,735.85 was paid by Dairy Service to Marjorie for the covenant not to compete, that Dairy Service is entitled to amortize this amount over the 10-year life of the covenant, and that this amount is taxable to Marjorie as ordinary income in the taxable year 1959. Petitioner Dairy Service takes the position that the payment of the $10,735.85 was for a covenant not to compete and that it is entitled to amortize this amount over a 10-year period. Petitioner, Marjorie, takes the position that the entire $15,000 payment was for the dairy accounting service business including the goodwill of the business and therefore is taxable only as gain on the sale of a capital asset. She takes the further position that there was no economic reality to the covenant not to compete since under North Carolina law it was not enforceable. For this additional reason Marjorie contends that no portion of the $15,000 which was paid to her by Dairy Service should be considered to be for the covenant not to compete. The situation in this case is *188 one which has arisen in a number of instances where the seller of a going business takes the position that the entire payment is for the business including the goodwill and therefore taxable only as gain on the sale of the capital asset and the purchaser takes the position that a portion of the payment is for a covenant not to compete which he is entitled to amortize over the life of the contract. See the recent case of , in which the cases of the sellers and purchasers of a sole proprietorship had been, as here, consolidated for trial and opinion. See also , and , aff'd. (C.A. 10, 1954). In the instant case, the buyer, Dairy Service contends that the contract is clear as to the portion of the price paid for the covenant. In addition Dairy Service stresses the portions of the evidence showing the necessity for the covenant and its value to the purchaser, and the mentions made of the covenant early in the negotiations for the purchase of the business. Marjorie argues that in negotiating *189 the contract of sale she was only interested in the amount she would receive for the sale of the business and not to what specific items that amount was allocated. She states that she lacked knowledge of the tax effect resulting from allocation of a portion of the purchase price to a covenant not to compete. She therefore contends that the allocating of a portion of the purchase price to the covenant should not be controlling as to the true nature of the payment. In the many cases dealing with covenants not to compete included in contracts of sale of going businesses, various criteria have been considered as bearing on the basically factual issue of whether in good faith the parties bargained for, bought and sold the agreement not to compete as an item distinguishable from the goodwill of the business. It has been recognized that such a covenant will necessarily have some relationship to the goodwill of the business. However, if the primary function of the covenant is not the protection of the goodwill transferred to the vendee but rather the protection of the purchaser from competition by *190 the seller, in situations where the possibility of such competition is economically realistic, the payment for the covenant has been recognized to be ordinary income to the seller and a capital asset to the purchaser which may be amortized over the life of the contract. (C.A. 5, 1966) affirming a Memorandum Opinion of this Court; , affd. (C.A. 5, 1964); and . In , we pointed out that where the facts establish that the covenant not to compete was executed after arm's-length negotiations between the contracting parties and under the terms of the contract so executed a payment for the covenant is fixed and agreed to, strong proof must be adduced by the party seeking to overcome the language as contained in the contract. In the instant case the testimony shows that early in the negotiations for the sale by Marjorie of the Dairy Accounting Service business to Dairy Service, Calhoun and Michael who were negotiating on behalf of the corporation stated that they would not *191 purchase the business without Marjorie's agreement not to compete. This is the testimony of both Calhoun and Marjorie. The evidence also shows that the first draft of the sales contract, which Marjorie took home and studied over the weekend, contained a covenant not to compete as well as a penalty for violation of that covenant. In this draft of the contract a blank space was left for allocation of a specific portion of the purchase price to the covenant not to compete. The testimony of both Calhoun and Marjorie is that Marjorie suggested the inclusion in the contract of a definition of the business of Dairy Accounting Service with which she agreed not to compete and a specific provision that she was not limited from competing with the purchaser in other respects. The evidence also shows that various figures were inserted in the blank spaces left in the paragraph of the draft contract dealing with the allocation of the purchase price during the time the draft of the contract was in Marjorie's custody. The record does not disclose with certainty who placed the figures in these spaces. The only conflict in the evidence is with respect to when during the negotiations the allocation *192 of the $15,000 total purchase price was made. Calhoun's testimony is that the amount of the net worth of the business and the value of its goodwill were agreed upon prior to reaching an agreement as to the total amount of the purchase price to be paid for the proprietorship, Dairy Accounting Service. Marjorie testified that agreement was first reached as to the total purchase price of $15,000 and thereafter the allocation of the $15,000 to net worth, goodwill and the covenant not to compete was made. Both Calhoun and Marjorie testified with respect to separate negotiations for the taking over of the accounts receivable and the payment of the accounts payable by the purchasers and the retention of the leased premises and furnishings by the seller. Marjorie's major argument is that the evidence shows that the overall purchase price was negotiated and then allocation to the items made and that this fact indicates that the covenant not to compete was in effect only a part of the goodwill. We do not agree with Marjorie's conclusion that if we accept her testimony that agreement was reached as to the total purchase price of $15,000 before amounts were allocated to net worth, goodwill, *193 and the covenant not to compete, it follows that the entire payment was for the net worth and goodwill of the business being sold. From the testimony we conclude that Marjorie was not as interested as Calhoun and Michael in the allocation of the purchase price among the three items set forth in the contract. This was because Marjorie apparently was not as aware of the tax consequences which might result from such allocation as was Calhoun. The evidence shows that Calhoun and Michael informed Marjorie that there was a tax advantage to the purchaser in having a specific allocation of a portion of the purchase price to the covenant not to compete. Marjorie testified that she was so informed but that she was not aware that this allocation might result in a tax disadvantage to her. Nevertheless, the evidence shows that Marjorie understood the meaning of the covenant not to compete and agreed during the negotiations not only to enter into the covenant not to compete but also to the amount of the purchase price allocated to the covenant not to compete. The evidence also shows that the covenant had economic reality in that Marjorie was highly thought of by the existing clients of Dairy Accounting *194 Service and had the ability to be persuasive in selling her ideas of management services to dairy operators. The record further shows that although there was some goodwill to the business, it was of minor value to the purchaser as compared to Marjorie's covenant not to compete. Calhoun had worked for Marjorie since approximately the beginning of her operation of Dairy Accounting Service. He knew the systems used, had been calling on clients, and knew the clients. Michael had been working for approximately a year for Dairy Accounting Service and was familiar with the client lists and the accounting records system of the Dairy Accounting Service business. Viewing the goodwill as the reputation of Dairy Accounting Service, it had been decreasing in value as Marjorie had been paying less attention to the clients after going into the mutual funds business. Viewing the goodwill of the business as consisting in part of the data cards, the information was within the knowledge of Calhoun and Michael and therefore not of the value to them that it might have been to a different purchaser. Under these circumstances we conclude that the allocation of only $300 to goodwill and of $10,735.85 to *195 Marjorie's covenant not to compete was realistic and was not something slipped into the contract for the tax advantage to the purchaser after the contract had been negotiated as was the situation in , affd. (C.A. 9, 1961). In , in concluding that in reality no part of the purchase price was for the covenant not to compete, we pointed out the unlikelihood of the seller entering into competition with the purchaser, the limited period of the covenant and the difficulty of discerning what practical importance or value the covenant had to the purchasers other than to reduce their taxes. We likewise pointed out the considerable goodwill that the business which was being purchased had built up over its years of operation. In , we recognized that when the parties to the transaction for purchase and sale of a business have specifically set out covenants in the contract and have given them an assigned value, strong proof must be adduced to overcome the declaration of the contract. In that case we considered that such strong proof had been adduced. *196 In the instant case the evidence shows that Marjorie's covenant not to compete was of greater value to the purchaser than the goodwill of the business, that the covenant was mentioned early in the negotiations for the sale, that both parties were aware of the fact that a separate portion of the purchase price would be allocated to the covenant during the negotiations, and that the final contract containing the separate allocation of the purchase price was signed by Marjorie after she had had it reviewed by a lawyer. We therefore conclude that the covenant not to compete was an item purchased and sold in the contract, and we will not upset the amount of the purchase price assigned by the parties to this covenant. Furthermore, as we stated in , with respect to an argument that an unrealistically high portion of the purchase price was assigned to the covenant not to compete, we do not think such a fact alone, if accepted, is sufficient to overcome the other strong evidence supporting the covenant as a separate purchase. Marjorie's final argument is that *197 the amount allocated to the covenant not to compete had no basis in economic reality since under North Carolina law the agreement was void and unenforceable. Marjorie cites a number of cases dealing with agreements not to compete connected with the sale of businesses and agreements of employees not to compete with former employers. Marjorie relies strongly on (C.A. 4, 1955), which involved an employment agreement between the petitioner corporation and a hostess providing that the hostess would not during the time of her employment by Welcome Wagon and for a period of 5 years thereafter, engage, directly or indirectly for herself or as an employee for others, in the same kind or similar business as that engaged in by her employer in Gastonia, North Carolina, or in any other place in the United States or Canada in which the employer was then engaged, had been, or had signified an intention to engage in rendering its services. The Court held that under North Carolina law which it must follow the covenant was so broad as to be void but that even if the covenant was not void, it was not of the type which had been shown to be enforceable *198 in equity as distinguishable from a suit at law for damages and concluded by stating the following: Finally, counsel for Welcome Wagon contend that if we hold (and we have so held) that the restrictive covenant, taken in its entirety, is void, we might treat this covenant as separable into parts, that we might hold it valid in so far as this covenant applies to the City of Gastonia, and that we might enjoin Morris from pursuing her present activities in Gastonia. We cannot agree with this suggestion. We think the restrictive covenant must be judged as a whole and must stand or fall when so judged. In which is not cited in Marjorie's brief, the Court in discussing an agreement in an employment contract not to compete, similar in all material respects to that involved in , stated at page 742: * * * She relies heavily on Welcome Wagon v. Morris, decided by the U.S. Court of Appeals for the Fourth Circuit and reported in . While there are minor factual differences between this and the Morris case, nevertheless we confine *199 comment to the simple statement that in our opinion, that decision does not follow the general rule and is not based on the sounder reasoning. The general rule is stated in : "It is clear that if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons and customers of his former employer, and thereby gain an unfair advantage, equity will interpose in behalf of the employer and restrain the breach * * * providing the covenant does not offend against the rule that as to time * * * or as to the territory it embraces it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer. * * * The citations used by the Court following the *200 above quoted statement were stated in the main to refer to covenants ancillary to contracts of sale, but the Court stated that the rule is the same as to the validity of contracts not to compete with an employer after termination of employment. In reversing the holding of the lower court against the employer and holding for the employer the Court stated as follows (page 743): * * * According to the allegations, the plaintiff was established in business at the time the defendant executed the written contract and entered plaintiff's employment. She resigned after receiving the benefits for several years, began a competitive business immediately, and took with her all of plaintiff's customers. In short, she took over plaintiff's business. The actual result appears to furnish a valid reason for the covenant. "There is no ambiguity in the restrictive covenant. It was inserted for the protection of the plaintiff and to inhibit the defendant for a limited time, from doing exactly what he now proposes to do. * * * The parties regarded it as reasonable and desirable when incorporated in the contract. Subsequent events, as disclosed by the record, tend to confirm rather than refute, this belief. *201 " Sonotone Corp. v. Baldwin, 227 N.C. 387, . In (C.A. 5, 1965), the Court in a footnote referred to , as being in express language disapproved by the Supreme Court of North Carolina in In , the Court stated in referring to the reasonableness of the contract as to territory as follows (page 742): The Court is without power to vary or reform the contract by reducing either the territory or the time covered by the restrictions. However, where, as here, the parties have made divisions of the territory, a court of equity will take notice of the division the parties themselves have made, and enforce the restrictions in the territorial divisions deemed reasonable and refuse to enforce them in the divisions deemed unreasonable. It is patent that division (1) - Fayetteville - is not unreasonable. Likewise it appears that divisions (3) and (4) - any city or town in the United States in which the *202 plaintiff is doing, or intends to do business - are unreasonable and will not be enforced. Whether (2) is reasonable is for the chancellor. "Where the territory embraced in restrictive covenants is unreasonable, but is expressed in divisible terms, i.e., in terms of local geographical or governmental units, the majority of the courts enforce the covenant in as many of the units as are reasonable and disregard the remainder." * * * It will be noted that since at one time Marjorie had been with McClain in a National Dairy Service business, it could not be said without proof to the contrary that directly competing within the United States was unreasonable in this case. The sentence in the covenant following the one dealing with competing in the United States that "the Seller shall not canvass, solicit or accept any business of a similar kind to the one being sold" to Dairy Service, from any present or past client of Dairy Accounting Service is a reasonable restriction. The evidence here is not sufficient to conclude that the covenant is void under North Carolina law. We will not presume without *203 proof that the parties entered into a contract a part of which is void under the law of the State in which it was entered into. Furthermore, Marjorie has cited no authority for her conclusion that an amount paid in good faith for a covenant not to compete should be considered as paid for goodwill if the covenant was so broadly worded as to be void under the law of the state in which the agreement was entered into. Under the facts here present, it is unnecessary to determine whether a showing that the covenant was void under North Carolina law would cause the payment made therefor to be other than ordinary income to Marjorie since Marjorie has not shown the covenant not to compete to be void under North Carolina law. Marjorie has abided by the covenant and therefore the question of its enforceability in equity or the validity of the provision for liquidated damages for Marjorie's violation of the covenant has not arisen. The evidence here does not support a conclusion that the covenant lacks economic reality because of being void under North Carolina law. We sustain respondent in his inclusion in Marjorie's income for 1959 of the $10,735.85 allocated in the sales contract to the *204 covenant not to compete and hold that Dairy Service is entitled to amortize this same amount over the 10-year period of the covenant. Since there appear to be certain uncontested adjustments, Decisions will be entered under Rule 50.